Melisa A. Rosadini-Knott
mrosadini@peifferwolf.com
(California Bar No. 316369)
**PEIFFER WOLF CARR
KANE CONWAY & WISE LLP**
3435 Wilshire Blvd., Ste. 1400
Los Angeles, CA 90010-1923
323-982-4109


[Additional counsel listed on signature page]
*Attorneys for Plaintiff and the Proposed Class*

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **JOANNA SEMONIOUS**, *individually and on behalf of all others similarly situated*,<br><br>*Plaintiff*,<br><br>v.<br><br>**SONY ELECTRONICS, INC. and SONY CORPORATION OF AMERICA**,<br><br>*Defendants*. | Case No.: **'26CV1833 CAB BLM**<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>1. INVASION OF PRIVACY – INTRUSION UPON SECLUSION;<br>2. INVASION OF PRIVACY – PUBLIC DISCLOSURE OF PRIVATE FACTS;<br>3. INVASION OF PRIVACY IN VIOLATION OF THE CALIFORNIA CONSTITUTION;<br>4. VIOLATIONS OF CAL. PENAL CODE §§ 631;<br>5. VIOLATIONS OF CAL. PENAL CODE § 632;<br>6. VIOLATIONS OF CAL. PENAL CODE §§ 638.50–638.51<br>7. VIOLATIONS OF CAL. PENAL CODE § 502;<br>8. VIOLATIONS OF 18 U.S.C. § 2510;<br>9. VIOLATIONS OF 18 U.S.C. § 2710;<br>10. NEGLIGENCE;<br>11. BREACH OF IMPLIED CONTRACT;<br>12. VIOLATIONS OF CAL. BUS. & |

CLASS ACTION COMPLAINT

PROF. CODE § 17200;

13. UNJUST ENRICHMENT;

14. AND INJUNCTIVE RELIEF.

CLASS ACTION COMPLAINT

Plaintiff Joanna Semonious, individually and on behalf of all similarly situated persons, alleges the following against Defendants Sony Electronics, Inc. and Sony Corporation of America (collectively, "Defendant" or "Sony ") based upon personal knowledge with respect to herself and on information and belief derived from, among other things, investigation by Plaintiff's counsel and review of public documents as to all other matters:

## I.     INTRODUCTION

1.     Modern televisions are no longer passive entertainment devices. Sitting in millions of American living rooms, today's "Smart TVs" operate as sophisticated surveillance systems—continuously monitoring what appears on the screen and transmitting detailed records of consumers' viewing behavior to manufacturers and advertising companies.

2.     Defendant Sony Electronics, Inc. and Sony Corporation of America (collectively, "Sony" or "Defendant") manufacture and sell internet-connected televisions, including the BRAVIA line of Smart TVs used by millions of consumers across the United States.

3.     Unbeknownst to consumers, Sony Smart TVs incorporate Automatic Content Recognition ("ACR") technology and related tracking systems (collectively, the "ACR Tools") that continuously monitor and analyze what appears on the television screen.

4.     The ACR Tools operate by capturing snippets of audio and video from whatever content is displayed on the screen, generating a unique digital "fingerprint," and matching that fingerprint against databases of known media content to determine precisely what a user is watching, in real time.

5.     Through this technology, Sony identifies the specific programs, films, advertisements, and other media viewed by individuals within the privacy of their homes.

6.     Critically, this monitoring is not limited to content provided by Sony. ACR technology *captures viewing activity across all inputs and applications*, including:

- streaming services such as Netflix, Hulu, and YouTube;
- cable and broadcast television;
- video game consoles;

1

• Blu-ray players;

• streaming devices such as Roku or Apple TV; and

• laptops or other devices connected through HDMI—*including when users display personal photos, videos, or other private content on their television screens.*

7.      In other words, Sony Smart TVs monitor *virtually everything displayed on the screen*, regardless of its source.

8.      In connection with this monitoring, Sony collects and transmits persistent identifiers associated with the television and the household, including IP addresses, device identifiers, and other unique identifiers that enable Sony and its partners to distinguish and recognize devices over time.

9.      Upon information and belief, Sony and its third-party partners, including ACR providers such as Samba TV, combine consumers' viewing activity with these identifiers—and with additional identifiers obtained from other sources, such as hashed email addresses and mobile advertising IDs—to link the television to other devices associated with the same individual or household, including smartphones, tablets, and computers.

10.      Through these practices, Sony and its partners create cross-device linkages and identity profiles that associate specific individuals and households with detailed records of their viewing behavior across platforms and contexts.

11.      The information collected and derived through these practices (the "Sensitive Information") includes: (i) consumers' video-viewing activity and the specific content they watch; (ii) information displayed on the television screen during use; (iii) device-level and network identifiers, including IP addresses and persistent device identifiers; (iv) cross-device identifiers and linkages, including identifiers that associate the television with other devices and accounts; and (v) inferences drawn from the foregoing, including consumers' interests, habits, and personal characteristics.

CLASS ACTION COMPLAINT

12. Sony, together with its advertising and analytics partners, aggregates and analyzes this Sensitive Information to generate detailed behavioral profiles describing consumers' viewing habits, interests, and personal characteristics.

13. Sony and its partners use this information to enable targeted advertising, audience segmentation, and advertising analytics services, including across televisions, mobile devices, and other connected devices.

14. Sony's surveillance system allows it and its advertising partners to infer intimate details about consumers, including political preferences, religious beliefs, health conditions and medical concerns, sexual orientation, family composition (such as the presence and ages of children), financial status, and even highly sensitive life events such as pregnancy, fertility struggles, or addiction—and this data is extracted precisely for this purpose. Once obtained, this data has immense value to Sony and its advertising partners, and is used to segment, target, and manipulate consumers in ways that exploit those intimate insights into their personal lives.

15. Sony implemented this system without obtaining meaningful, informed consent from consumers.

16. Instead, Sony obscures its ACR surveillance through confusing disclosures, deceptive terminology, and manipulative user-interface design intended to steer consumers into enabling the surveillance features.

17. As a result, Plaintiff and millions of Sony Smart TV owners have had their viewing behavior secretly monitored and monetized without their knowledge or consent.

18. Sony's conduct violates numerous federal and state privacy laws and constitutes an unlawful invasion of consumers' privacy.

19. Moreover, Defendant's tracking of Sony TV users violated the Video Privacy Protection Act ("VPPA"), which was passed specifically to prevent the disclosure and aggregation of data relating to an individual's video consumption.

20. As a result of Defendant's conduct, Plaintiff and Class Members have suffered numerous injuries, including: (i) invasion of privacy; (ii) lack of trust in communicating with

3

electronics retailers; (iii) emotional distress and heightened concerns related to the release of Sensitive Information to third parties, (iv) loss of benefit of the bargain; (v) diminution of value of the Sensitive Information; (vi) statutory damages; and (viii) continued and ongoing risk to their Sensitive Information.

21. Therefore, Plaintiff seeks, on behalf of herself and a class of similarly situated persons, to remedy these harms and assert the following statutory and common law claims against Defendant: invasion of privacy – intrusion upon seclusion; invasion of privacy – public disclosure of private facts; invasion of privacy in violation of the California Constitution; violation of the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 631, 632, and 638.50–638.51; violation of the Comprehensive Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502; violation of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2510, et seq.; violation of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710; negligence; breach of implied contract; violation of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq.; unjust enrichment; and injunctive relief.

## II.   THE PARTIES

### A. Plaintiff Joanna Semonious

22. Plaintiff Joanna Semonious is a resident and citizen of Tehachapi, California.

23. Plaintiff Semonious purchased a Sony BRAVIA Smart TV in 2018 and has used it regularly since then while in her home in Tehachapi, California.

24. Plaintiff Semonious, along with her spouse and her three minor grandchildren, regularly use the Sony Smart TV to access video-viewing content, including through streaming services such as YouTube, Netflix, Amazon Prime Video, Hulu, Paramount+, Disney+, and Peacock. The video-viewing content Plaintiff selected and watched within the privacy of her home constitutes private, sensitive information.

25. Since it was set up, Plaintiff Semonious' Sony Smart TV has operated on the Android TV platform (Android TV 8.0).

26. During Plaintiff's use of the device, Sony's ACR Tools—including the "Samba

4

CLASS ACTION COMPLAINT

Interactive TV" feature—were enabled and operating, unbeknownst to Plaintiff, such that the television captured, analyzed, and transmitted information regarding the audio and video content displayed on the screen.

27.	Plaintiff did not participate in the assembly, installation, or configuration of the Sony Smart TV. Those steps were performed exclusively by her spouse. At no time was Plaintiff presented with, or did she agree to, any terms of use, privacy disclosures, or consent mechanisms describing or authorizing Sony's or its partners' collection, interception, or use of her viewing activity or associated data.

28.	Unbeknownst to Plaintiff, Sony's ACR Tools and related tracking technologies surreptitiously intercepted and disclosed her Sensitive Information during her use of the Sony Smart TV. This included, but was not limited to, the specific programs and content she viewed, applications she accessed, device-level identifiers, and her IP address, as well as information displayed on her television screen during ordinary use.

29.	Upon information and belief, Sony and its partner Samba TV supplemented these data points with additional identifying information obtained from third parties, including hashed email addresses (e.g., SHA-256), mobile advertising identifiers, additional IP addresses, and connected TV ("CTV") device identifiers, to facilitate persistent identification.

30.	Using these identifiers, Sony and Samba TV identified Plaintiff's television and linked it to other devices associated with her household, including her mobile phone, tablets, and computers.

31.	Sony and Samba TV combined these identifiers to construct a unified identity profile for Plaintiff—referred to, upon information and belief, as a "SambaID"—which associated Plaintiff across multiple devices and contexts.

32.	Sony and Samba TV intercepted Plaintiff's video-viewing activity in real time, including content viewed on streaming platforms, and associated that activity with the identifiers tied to Plaintiff, including the SambaID.

33.	This data was used to enable targeted advertising and audience segmentation.

5

CLASS ACTION COMPLAINT

Upon information and belief, Samba TV disclosed or made this data available to advertisers and publishers, allowing them to target Plaintiff across her television, mobile devices, and computers, and to include her in proprietary audience segments and measurement panels.

34.    Plaintiff Semonious never authorized Defendants to collect, intercept, analyze, monetize, or disclose her Sensitive Information. Plaintiff did not consent to the interception of her viewing activity or device identifiers, the creation of cross-device identity profiles, or the use of her private viewing behavior for advertising or other commercial purposes.

**B.    Defendant Corporations**

35.    Defendant Sony Electronics, Inc. ("Sony Electronics") is a Delaware corporation regularly transacting, soliciting, and conducting business in California with a principal place of business at 16535 Via Esprillo, San Diego, CA 92127. Sony Electronics may be served through its registered agent for service of process, Corporate Service Company d/b/a CSC Lawyers Incorporating Service Company at 2710 Gateway Oaks Drive, Suite 150N, Sacramento CA 95833. Plaintiff requests service at this time.

36.    Defendant Sony Corporation of America ("Sony America") is a New York corporation regularly transacting, soliciting, and conduction business in California with a principal place of business at 25 Madison Avenue, New York, NY 10010. Sony America may be served through its registered agent for service of process, Corporate Service Company d/b/a CSC Lawyers Incorporating Service Company at 2710 Gateway Oaks Drive, Suite 150N, Sacramento CA 95833. Plaintiff requests service at this time.

37.    Sony Corporation of America is the American arm of the Japanese global manufacturer Sony Group Corporation and creates consumer electronics including TVs, gaming consoles, cameras, and audio devices.

38.    Sony knowingly and intentionally incorporated ACR Tools, such as Samba TV, into their televisions to track Plaintiff's and Class Members' video-viewing history and other activities.

CLASS ACTION COMPLAINT

39. Sony developed a persistent, unique identifier designed to accurately link Plaintiff's and Class Members' video-viewing history and online activity to their individual identities.

40. Sony knew that its unique identifier and identity graph solution were inconsistent with expectations of privacy because it had publicly stated that tracking individuals in such a manner raised privacy concerns.

41. Sony knowingly and intentionally used its identifiers, and video-viewing data associated with it, to facilitate targeted advertisements for profit

### III.   JURISDICTION AND VENUE

42. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because the amount in controversy exceeds $5,000,000, exclusive of interest and costs; the proposed class contains more than 100 members; and minimal diversity exists because at least one class member is a citizen of a state different from Defendants.

43. This Court also has federal question jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law, including the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710, and the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2510 et seq.

44. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, because those claims arise from the same common nucleus of operative facts as the federal claims.

45. This Court has personal jurisdiction over Defendant because they have purposefully availed themselves of the privilege of conducting business in California, and because Defendant Sony Electronics, Inc. has its principal place of business in this District.

46. Defendant design, manufacture, market, distribute, and sell Smart TVs throughout California, including within this District.

47. Defendant derive substantial revenue from the sale of Smart TVs in California and from the monetization of consumer data collected from those devices.

7

CLASS ACTION COMPLAINT

48. Defendant also direct advertising, software updates, and data collection services toward Smart TVs located in California, including those owned by Plaintiff and members of the proposed class.

49. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

50. Specifically, Sony Smart TVs equipped with ACR technology were sold, installed, and used by consumers within this District.

51. The unlawful collection and transmission of viewing data described in this Complaint occurred on devices located within this District.

52. Venue is proper in the San Diego Division of the Southern District of California because Plaintiff and members of the proposed class reside in this Division and the conduct giving rise to the claims occurred here.

## IV.      SONY'S SMART TV BUSINESS

53. Sony manufactures and sells Smart TVs in the United States under the BRAVIA brand.

54. Sony's Smart TVs are internet-connected devices capable of running streaming applications, connecting to external media devices, and interacting with other smart devices within a consumer's home.

55. Sony markets these televisions as convenient, centralized platforms for accessing digital media and streaming services.

56. Sony sells millions of Smart TVs in the United States each year and has placed such devices in millions of American households.

57. Because televisions are typically located in shared household spaces—such as living rooms and bedrooms—a single Sony Smart TV is regularly used by multiple individuals within a household, including family members and guests.

58. As a result, each Sony Smart TV provides Sony with access to detailed behavioral and viewing information concerning multiple individuals within the same household.

8

CLASS ACTION COMPLAINT

59.     This household-level surveillance allows Sony to collect and monetize viewing data not only from the purchaser of the television, but from all individuals who use it—regardless of whether those individuals received notice of or consented to such data collection.

## V.     AUTOMATIC CONTENT RECOGNITION TECHNOLOGY

60.     Automatic Content Recognition ("ACR") is a technology designed to identify what media content is displayed on a television.

61.     ACR operates by continuously capturing portions of the audio and video output from the television and converting those fragments into unique digital "fingerprints."

62.     These fingerprints are then compared against proprietary databases of known media content.

63.     When a match is identified, the system can determine precisely what program, video, or advertisement is being viewed.

64.     The identified viewing data is then transmitted to remote servers, where it is aggregated, analyzed, and linked to device- and household-level identifiers.

65.     Through this process, ACR enables the collection of granular information, including:

• what content consumers watch;

• when they watch it;

• how long they watch it; and

• what advertisements they are exposed to.

66.     This information is highly valuable to advertisers because it enables precise targeting and measurement of advertising effectiveness across multiple devices.

67.     ACR technology has accordingly become a central component of the connected television ("CTV") advertising ecosystem.

68.     Unlike traditional audience-measurement systems such as Nielsen—which rely on voluntary participation and compensate consumers—ACR systems operate continuously, extract data without compensation, and often without meaningful disclosure or informed consent.

9

CLASS ACTION COMPLAINT

69.    Regulators have recognized the intrusive nature of ACR. For example, in a recent complaint filed by the Texas Attorney General against major smart-TV manufacturers, including Sony, Texas explained that ACR technology works by capturing "audio and visual data of what you're watching on TV … to build a 'fingerprint' of the content" and matching it against a database to identify precisely what is viewed.

70.    Notably, within weeks of Texas filing its suit against Samsung for its privacy-invasive, deceptively implemented ACR technology, Samsung agreed to "promptly update its smart TVs and implement disclosures and consent screens that are clear and conspicuous to ensure that Texans can make an informed decision regarding whether their data is collected and how it's used."[1]

### VI.    SONY'S ACR SURVEILLANCE PROGRAM

71.    Sony has incorporated ACR technology into certain Smart TVs since approximately 2013.

72.    Sony implements this functionality in part through third-party technology providers, including Samba TV, which supplies software used to monitor and analyze viewing activity.

73.    Within Sony Smart TVs, this ACR functionality is often presented to consumers under labels such as "Interactive TV" or "Samba Interactive TV."

74.    Sony describes this feature as providing personalization, recommendations, or enhanced viewing experiences.

75.    In reality, the feature operates as a continuous surveillance mechanism that monitors and records the media displayed on the television.

76.    When enabled, Sony's ACR system continuously captures audio and video data from the television screen during ordinary use.

---

[1]    https://www.texasattorneygeneral.gov/news/releases/attorney-general-paxton-secures-major-agreement-samsung-ensure-texans-are-protected-smart-tvs

10

CLASS ACTION COMPLAINT

77. The system identifies the content being displayed and records detailed information about each viewing session.

78. This data includes, but is not limited to:

• the specific programs and videos watched;

• the advertisements viewed;

• the applications used;

• the timing and duration of viewing sessions; and

• information about devices connected to the television.

79. Sony aggregates this data to create household-level viewing profiles.

80. These profiles are used by Sony and its advertising partners to deliver targeted advertising across televisions and other connected devices.

81. Because ACR monitors all content displayed on the screen, it captures viewing information regardless of source—including content from streaming applications, cable or broadcast television, and external devices connected via HDMI.

82. As a result, Sony's ACR system surveils viewing behavior even when consumers are using third-party services or devices that are independent of Sony.

83. As regulators have observed, ACR technology captures content from streaming apps, cable television, and external devices such as gaming consoles and Blu-ray players, thereby enabling comprehensive monitoring of in-home media consumption.

**VII.   SONY'S COLLECTION OF HIGHLY SENSITIVE VIEWING DATA**

84. The viewing information captured through Sony's ACR system is highly sensitive and revealing.

85. A consumer's television viewing habits reflect detailed information about that individual's interests, beliefs, and personal circumstances.

86. For example, viewing behavior can reveal information relating to:

• political preferences and affiliations;

• religious beliefs and practices;

11

CLASS ACTION COMPLAINT

• sexual orientation;

• health conditions and medical concerns;

• family composition, including the presence and ages of children; and

• age, socioeconomic status, and other demographic characteristics.

87. Sony aggregates this viewing data into consumer profiles used for targeted advertising and behavioral segmentation.

88. These profiles are linked to persistent identifiers and, upon information and belief, are associated with identifiers tied to other devices belonging to the same individual or household.

89. Through this linkage, Sony correlates viewing activity from Smart TVs with data collected from smartphones, tablets, and computers.

90. This cross-device tracking enables Sony and its advertising partners to construct detailed identity graphs and comprehensive behavioral profiles of consumers across contexts and devices.

## VIII. SONY'S MARKETING AND REPRESENTATIONS REGARDING SMART TV FUNCTIONALITY AND PRIVACY

83. Sony markets its BRAVIA Smart TVs as premium entertainment devices designed to provide consumers with seamless access to content and a personalized viewing experience.

84. In its marketing materials and user-facing disclosures, Sony represents that features such as "Interactive TV" or "personalized recommendations" enhance the user experience by tailoring content suggestions to the viewer.

85. Sony promotes these features as tools that help users "discover content," "enhance viewing," and "personalize" their entertainment experience.

86. These representations convey to reasonable consumers that any data collection associated with such features is limited, user-beneficial, and tied to improving on-screen recommendations.

12

CLASS ACTION COMPLAINT

87.    Sony does not disclose in its marketing materials that these features function by continuously capturing and analyzing the audio and video displayed on the television screen, including content viewed through third-party applications and external devices.

88.    Nor does Sony disclose that this viewing data is transmitted to third parties, including advertising and data analytics companies, for purposes unrelated to providing core television functionality.

89.    Sony further fails to disclose that the data collected through ACR is used to construct cross-device identity profiles and to facilitate targeted advertising across multiple devices and platforms.

90.    To the extent Sony provides disclosures regarding data collection, such disclosures are incomplete, obscured, and presented, if at all, during initial device setup—often to a different individual than the end users of the television.

91.    Sony's marketing and disclosures omit material facts necessary to prevent its representations regarding personalization and user control from being misleading.

92.    Reasonable consumers, including Plaintiff, would not expect that simply watching television in their homes would result in the continuous interception, analysis, and disclosure of their viewing activity and associated identifiers to third parties.

93.    Had Plaintiff known the true nature and scope of Sony's data collection and sharing practices, she would not have purchased the Sony Smart TV or would have paid substantially less for it.

**IX.    SONY PURPORTS TO OBTAIN—BUT DOES NOT OBTAIN—CONSUMER CONSENT THROUGH DECEPTIVE DESIGN.**

91.    Sony does not meaningfully disclose its ACR surveillance practices to consumers.

92.    Instead, Sony presents the ACR feature during the television setup process using misleading terminology and opaque disclosures.

13

CLASS ACTION COMPLAINT

93. For example, Sony labels the ACR feature "Interactive TV" or "Samba Interactive TV," terminology that does not convey that the feature enables continuous monitoring of television viewing.

94. During the setup process, consumers are required to navigate through multiple screens containing dense legal text before reaching a consent screen.

95. Most consumers click "Agree" simply to complete the setup process and begin using the television.

96. Sony intentionally presents its privacy policies during the initial setup process when consumers are most eager to begin using their new televisions.

97. Sony's disclosures fail to explain that enabling the feature allows Sony to continuously capture and analyze the audio and video displayed on the television screen.

98. Sony also fails to disclose that the resulting viewing data will be used to create advertising profiles or identity graphs and shared with advertising partners.

99. Even after setup, consumers who wish to disable the surveillance feature must navigate through multiple menus and obscure settings to locate the opt-out controls.

100. This design—easy opt-in combined with difficult opt-out—is a well-known manipulative interface technique commonly referred to as a "dark pattern."

101. As a result, millions of consumers have unknowingly enabled Sony's ACR surveillance.

**X.      SONY PROFITS FROM ITS SURVEILLANCE OF CONSUMERS.**

**A.      Sony Derived Significant Benefits from Its Collection and Use of Plaintiff's and Class Members' Sensitive Information.**

102. The viewing data collected through Sony's ACR system is extremely valuable.

103. The viewing data collected through Sony's ACR system is highly valuable in the digital advertising marketplace.

104. Advertisers and data analytics companies pay substantial sums for access to granular data reflecting consumers' viewing habits, interests, and behaviors.

CLASS ACTION COMPLAINT

105. By collecting, analyzing, and monetizing this data, Sony generates significant revenue through advertising, audience segmentation, and analytics services.

106. Sony therefore has a strong financial incentive to maximize both the volume and granularity of the consumer data it collects.

107. Upon information and belief, Sony implemented and expanded its ACR system as part of a broader strategy to monetize consumer data through targeted advertising and cross-device tracking.

108. The data collected through Sony's ACR Tools is used to build household-level and cross-device identity profiles, which are then leveraged to enable targeted advertising across televisions, mobile devices, and computers.

109. These practices allow Sony and its partners to deliver highly targeted advertisements, measure advertising effectiveness, and sell access to valuable audience segments.

110. As a direct result of its surreptitious collection, use, and disclosure of Plaintiff's and Class Members' Sensitive Information, Sony has generated, and continues to generate, substantial revenue attributable to its data-driven advertising and analytics operations.

111. Through these practices, Sony has been unjustly enriched at the expense of Plaintiff and Class Members, whose private viewing information was collected and monetized without their knowledge or informed consent.

**B.      Plaintiff's and Class Members' Data Had Independent Financial Value.**

112. Plaintiff's and Class Members' Sensitive Information has independent economic value in the marketplace for consumer data.

113. Industry data confirms that consumer data has substantial and increasing per-user value, as reflected in growing revenues from targeted advertising and the existence of programs in which companies compensate consumers in exchange for access to their behavioral data, demonstrating that such information is a recognized and tradable asset.

114. According to the financial statements of Facebook, a major data and advertisement broker, the value derived from user data has continuously risen. "In 2013, the

CLASS ACTION COMPLAINT

average American's data was worth about $19 per year in advertising sales to Facebook, according to its financial statements. In 2020, [it] was worth $164 per year."[2]

115.    Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

116.    Companies routinely pay for access to user-level behavioral data, including browsing activity, viewing habits, and device-level identifiers, because such data enables precise targeting and profiling. For example, several companies have products through which they pay consumers for a license to track certain information. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing history information.

117.    By contrast, Sony obtained Plaintiff's and Class Members' Sensitive Information without compensation and without informed consent, while retaining the full economic benefit of that data.

118.    The unauthorized interception and disclosure of Plaintiff's and Class Members' Sensitive Information diminished the value of that information and deprived them of the ability to control, license, or otherwise monetize their own data.

119.    As a result, Plaintiff and Class Members have suffered economic harm.

## XI.    SONY'S USE OF THE ACR TOOLS VIOLATES NUMEROUS STATE AND FEDERAL DATA PRIVACY LAWS

### A.    The Video Privacy Protection Act ("VPPA")

120.    The VPPA was enacted in 1988 in response to Congress's concern that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No.

---

[2] Geoffrey A. Fowler, There's no escape from Facebook, even if you don't use it, THE WASHINGTON POST (Aug. 29, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/ (last visited Feb. 1, 2025).

CLASS ACTION COMPLAINT

100-599, at p. 7 (1988) (statement of Sen. Patrick Leahy).

121. Congress was particularly concerned with the privacy of individuals' media consumption, recognizing that:

> Books and films are the intellectual vitamins that fuel the growth of individual thought. The whole process of intellectual growth is one of privacy-of quiet, and reflection. This intimate process should be protected from the disruptive intrusion of a roving eye…These records are a window into our loves, lives, and dislikes.

*Id*. (statement of Rep. Al McCandless).

122. Although originally enacted in the context of videotape rentals, Congress has made clear that the VPPA applies to modern technologies, including "'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at p. 2.[3]

123. The VPPA prohibits a "video tape service provider" from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider" without the consumer's "informed, written consent… in a form distinct and separate from any form setting forth other legal or financial obligations." 18 U.S.C. § 2710(b).

124. The statute defines a "video tape service provider" as any person "engaged in the business… of rental, sale, or delivery of… similar audio visual materials." 18 U.S.C. § 2710(a)(4).

125. It further defines "personally identifiable information" ("PII") as information

---

[3] *See also The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century*, SENATE JUDICIARY, SUBCOMMITTEE ON PRIVACY, TECHNOLOGY AND THE LAW (Jan. 31, 2012), *available online at* https://www.judiciary.senate.gov/download/hearing-transcript_-the-videoprivacy-protection-act-protecting-viewer-privacy-in-the-21st-century (statement by Senator Leahy, who originally introduced the VPPA in the Senate: "Now, it is true that technology has changed…but I think we should all agree that we have to be faithful to our fundamental right to privacy and freedom. Today the social networking, video streaming, the cloud, mobile apps, and other new technologies have revolutionized the availability of Americans' information.").

CLASS ACTION COMPLAINT

that identifies a person as having requested or obtained specific video materials or services. 18 U.S.C. § 2710(a)(3).

126.    Sony is a "video tape service provider" within the meaning of the VPPA because it is engaged in the business of delivering video content to consumers, including through its Smart TV platform, which provides access to on-demand streaming services and Sony's own video content offerings, including Sony TV Plus.

127.    As alleged herein, Sony, through its ACR Tools, knowingly intercepts and discloses consumers' video-viewing activity—including the specific programs and content viewed—along with persistent identifiers such as IP addresses, device identifiers, and other data that enable those viewing selections to be associated with a particular individual or household.

128.    These disclosures constitute the disclosure of "personally identifiable information" under the VPPA because they identify consumers as having requested or obtained specific video materials or services.

129.    Sony makes these disclosures to third parties, including advertising and analytics partners, for commercial purposes, including targeted advertising, audience segmentation, and measurement.

130.    Sony does so without obtaining consumers' informed, written consent in a form that is distinct and separate from other terms, and, in many cases, without providing any disclosure to the actual users of the television whose viewing activity is collected and disclosed.

131.    Courts have recognized that the VPPA applies to modern streaming technologies and evolving forms of audiovisual content delivery. *See, e.g., Fan v. NBA Props. Inc.*, No. 23-cv-05069-SI, 2024 U.S. Dist. LEXIS 57205, at *9 (N.D. Cal. Mar. 26, 2024) ("in enacting the VPPA, 'Congress[] inten[ded] to cover new technologies for pre-recorded video content'" and "used 'similar audio visual materials' to ensure that VPPA's protections would retain their force even as technologies evolve").

**B.    The Federal Trade Commission Act ("FTC Act")**

126.    Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45,

prohibits "unfair or deceptive acts or practices in or affecting commerce."

127. The FTC has long recognized that the unauthorized collection, use, and disclosure of consumers' personal information—particularly where such practices are not adequately disclosed or are inconsistent with consumer expectations—can constitute both unfair and deceptive practices under Section 5.

128. A practice is deceptive if it involves a material representation, omission, or practice that is likely to mislead reasonable consumers under the circumstances.

129. A practice is unfair if it causes or is likely to cause substantial injury to consumers that is not reasonably avoidable and is not outweighed by countervailing benefits to consumers or competition.

130. Sony's conduct, as alleged herein, constitutes both deceptive and unfair practices.

131. Sony represents its Smart TVs and associated features, including "Interactive TV" and similar functionality, as tools designed to enhance the user experience through personalization and content recommendations.

132. These representations are materially misleading because Sony fails to disclose that these features operate by continuously capturing and analyzing the audio and video displayed on consumers' television screens, including content viewed through third-party applications and external devices.

133. Sony further fails to disclose that this viewing data is transmitted to third parties, including advertising and analytics partners, and used to construct cross-device identity profiles for targeted advertising and other commercial purposes.

134. These omissions are material because reasonable consumers would not expect that simply watching television in their homes would result in the continuous interception, analysis, and disclosure of their viewing activity and associated identifiers.

135. Sony's practices are also unfair because they cause substantial injury to consumers, including the loss of control over highly sensitive viewing information and the

19

CLASS ACTION COMPLAINT

unauthorized exploitation of that information for commercial gain.

136. This injury is not reasonably avoidable by consumers, particularly where, as here, disclosures are absent, incomplete, or presented—if at all—only during device setup and often to individuals other than the actual users whose data is collected.

137. The harm caused by Sony's practices is not outweighed by any countervailing benefits to consumers or competition, as the continuous interception and monetization of viewing activity is not necessary to provide core television functionality.

138. For example, the FTC has brought enforcement actions against smart TV manufacturers for failing to adequately disclose ACR-based tracking and for sharing viewing data with third parties without meaningful consumer consent..

139. Sony's conduct, as alleged herein, falls squarely within the types of unfair and deceptive practices prohibited by the FTC Act.

140. The principles reflected in the VPPA and the FTC Act are consistent: consumers' video-viewing activity and associated identifiers are highly sensitive and cannot be collected, analyzed, and disclosed for commercial purposes without meaningful notice and informed consent. Sony's ACR-based surveillance practices violate these well-established privacy norms by enabling the continuous interception and monetization of consumers' viewing behavior—precisely the type of undisclosed, pervasive tracking that both Congress and federal regulators have repeatedly sought to prevent.

### XII.    CLASS ALLEGATIONS

141. This action is brought by the named Plaintiff both individually, and on behalf of a proposed Class of all other persons similarly situated under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

142. The Nationwide Class that Plaintiff seeks to represent is defined as follows:

**The Nationwide Class**

All natural persons who have owned a Sony Smart TV, and whose Sensitive Information was collected without their actual and/or constructive knowledge.

143. In addition to, or in the alternative to, the claims asserted on behalf of the Nationwide Class, Plaintiff asserts claims on behalf of separate California Subclass, which is defined as follows:

**The California Subclass**

All natural persons residing in California who own or have owned a Sony Smart TV, and whose Sensitive Information was collected without their actual and/or constructive knowledge.

144. The Nationwide Class and California Subclass are collectively referred to herein as the "Class." Excluded from the proposed Class are any claims for personal injury, wrongful death, or other property damage sustained by the Class; Defendant and its parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns; and any Judge conducting any proceeding in this action and members of their immediate families.

145. Plaintiff reserves the right to amend the definitions of the Class or add subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

146. **Numerosity.** The Class is so numerous that the individual joinder of all members is impracticable. There are at least 100,000 individuals that have been impacted by Defendant's actions. Moreover, the exact number of those impacted is generally ascertainable by appropriate discovery and is in the exclusive control of Defendant.

147. **Commonality.** Common questions of law and fact arise from Defendant's uniform conduct and are capable of classwide resolution. These common questions predominate over any questions affecting only individual Class Members and include, without limitation:

a) a) Whether Defendant's ACR-enabled collection, interception, and disclosure of Sensitive Information occurred in a substantially similar manner for all Class Members;

b) Whether Defendant collected, transmitted, and disclosed Class Members' Sensitive Information—including video-viewing activity and associated identifiers—to third parties without adequate notice or consent;

21

CLASS ACTION COMPLAINT

c)        Whether Defendant's disclosures, if any, regarding its data collection and sharing practices were misleading, incomplete, or insufficient to obtain informed consent;

d)        Whether Defendant and its partners used persistent identifiers to link Class Members' viewing activity across devices and to create cross-device identity profiles;

e)        Whether Defendant had a duty to refrain from collecting, intercepting, or disclosing Class Members' Sensitive Information without authorization;

f)        Whether Defendant's conduct constitutes an unlawful interception, disclosure, or use of Sensitive Information under the statutes asserted herein, including but not limited to the Video Privacy Protection Act;

g)        Whether the information disclosed by Defendant constitutes "personally identifiable information" or otherwise protected information under applicable law;

h)        Whether Defendant's conduct was unfair, unlawful, or deceptive;

i)        Whether Defendant was unjustly enriched by its collection and monetization of Class Members' Sensitive Information;

j)        Whether Class Members suffered injury, including invasion of privacy and loss of control over their Sensitive Information, as a result of Defendant's conduct;

k)        Whether Defendant's conduct entitles Plaintiff and Class Members to statutory, actual, nominal, and/or punitive damages; and

l)        Whether injunctive or declaratory relief is warranted to prevent Defendant's ongoing collection, use, and disclosure of Class Members' Sensitive Information.

148.        **Typicality.** Plaintiff's claims are typical of those of other Class Members because Plaintiff's Sensitive Information, like that of every other Class Member, was compromised as a result of Defendant's incorporation and use of the ACR Tools.

149.        **Adequacy**. Plaintiff will fairly and adequately represent and protect the of the members of the Class in that Plaintiff have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiff seek no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the

CLASS ACTION COMPLAINT

damages Plaintiff have suffered are typical of other Class Members. Plaintiff have also retained counsel experienced in complex class action litigation, and Plaintiff intend to prosecute this action vigorously.

150.    **Predominance**. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members in that all the Plaintiff's and Class Members' data was unlawfully stored and disclosed to unauthorized third parties, including third parties, like Google, in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

151.    **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

152.    Defendant acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

153.    Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

CLASS ACTION COMPLAINT

a)    Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Sensitive Information and not disclosing it to unauthorized third parties;

b)    Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Sensitive Information;

c)    Whether Defendant failed to comply with applicable laws, regulations, and industry standards relating to data security;

d)    Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Sensitive Information would be collected disclosed to third parties;

e)    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information collected and disclosed to third parties; and

f)    Whether Class Members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendant's wrongful conduct.

154.    Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the unauthorized disclosures that have taken place.

## XIII.    TOLLING AND ESTOPPEL

155.     Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of the incorporation of ACR Tools onto its Smart TVs.

156.    The ACR Tools on the Smart TVs were and are invisible to the average Smart TV user.

157.    Through no fault or lack of diligence, Plaintiff and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

158.    Plaintiff was ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

24

CLASS ACTION COMPLAINT

159. Defendant had exclusive knowledge that the Smart TVs incorporated ACR Tools and yet failed to disclose to users, including Plaintiff and Class Members, that by selecting and viewing content on their Sony Smart TVs, Plaintiff and Class Members' Sensitive Information would be disclosed or released to unauthorized third parties, including Samba TV.

160. Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of users' Sensitive Information. In fact, to the present, Defendant has not conceded, acknowledged, or otherwise indicated to users of its Smart TVs that Defendant has disclosed or released their Sensitive Information to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

161. Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

162. The earliest that Plaintiff or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of this Class Action Complaint.

### XIV.    CLAIMS FOR RELIEF

### COUNT I

### Invasion of Privacy – Intrusion Upon Seclusion

(On Behalf of Plaintiff and the Nationwide Class, or in the alternative, the California Subclass)

163. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

164. Plaintiff brings this claim under California common law.

165. At all relevant times, Plaintiff and members of the Class had a reasonable expectation of privacy in their homes and in the audiovisual content they viewed on their televisions.

166. The home is among the most private of spaces, and activities occurring within the home—including television viewing—are traditionally understood to be private.

CLASS ACTION COMPLAINT

167. Defendant Sony, through its Smart TVs and embedded ACR technology, intentionally intruded upon Plaintiff's and Class members' private affairs.

168. Specifically, Sony's Smart TVs continuously monitored what appeared on the television screen by capturing audio and visual information from content displayed on the device.

169. This monitoring occurred in near real time and operated continuously during use of the television.

170. Sony's ACR system captured information reflecting Plaintiff's viewing behavior, including the programs watched, the applications used, and the content displayed through external devices connected via HDMI.

171. This surveillance extended to content viewed through streaming services, broadcast television, and third-party devices such as gaming consoles, streaming boxes, and computers.

172. By capturing and analyzing this information, Sony intruded into Plaintiff's private viewing activity within the home.

173. Sony's conduct enabled it to construct detailed profiles of Plaintiff's interests, habits, and personal characteristics based on viewing behavior.

174. These profiles included sensitive information reflecting Plaintiff's preferences, beliefs, and lifestyle.

175. Sony's intrusion was intentional and systematic.

176. Sony designed, implemented, and deployed ACR technology for the purpose of collecting and monetizing consumer viewing data.

177. Sony's surveillance was not incidental to the operation of the television but was instead a core component of its data collection and advertising strategy.

178. Plaintiff and members of the Class did not consent to Sony's intrusion.

179. Any purported consent obtained by Sony was invalid because it was not informed, explicit, or meaningful.

26

CLASS ACTION COMPLAINT

180. Sony obscured the nature of its surveillance through misleading terminology, including labeling the feature as "Interactive TV" or "Samba Interactive TV," which did not disclose that the feature enabled continuous monitoring of on-screen content.

181. Sony further presented disclosures during a forced, multi-step setup process that pressured consumers to agree to all terms in order to use the television.

182. Sony's disclosures failed to clearly inform users that Sony would monitor and analyze the content displayed on their televisions.

183. Sony also failed to disclose that such information would be used for advertising, profiling, and data monetization purposes or shared with third parties.

184. Even where settings existed to disable ACR functionality, those settings were difficult to locate, buried within multiple layers of menus, and not clearly described.

185. Sony's consent framework therefore constitutes a "dark pattern" designed to obtain user acquiescence rather than informed consent.

186. Moreover, Sony's surveillance intruded upon the privacy of individuals who never interacted with Sony's disclosures or consent mechanisms, including other household members and guests.

187. Sony's intrusion into Plaintiff's private affairs would be highly offensive to a reasonable person.

188. A reasonable consumer would not expect that a television would continuously monitor and record the content displayed on its screen for the purpose of data collection and advertising.

189. Sony's conduct therefore constitutes an intentional intrusion upon the solitude and seclusion of Plaintiff and members of the Class.

190. As a direct and proximate result of Sony's conduct, Plaintiff and members of the Class have suffered harm, including invasion of privacy, loss of control over personal information, and related damages.

27

CLASS ACTION COMPLAINT

191. Plaintiff and members of the Class are entitled to all available legal and equitable remedies, including compensatory damages, injunctive relief, and any other relief deemed appropriate by the Court.

## COUNT II

### Invasion of Privacy – Public Disclosure of Private Facts

(On Behalf of Plaintiff and the Nationwide Class, or in the alternative, the California Subclass)

192. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

193. Plaintiff brings this claim under California common law.

194. At all relevant times, Plaintiff and members of the Class had a reasonable expectation that their television viewing activity and related information would remain private.

195. Defendant Sony, through its Smart TVs and embedded ACR technology, collected and disclosed private information concerning Plaintiff's viewing behavior.

196. Specifically, Sony collected detailed information about the audiovisual content displayed on Plaintiff's television, including the programs watched, the timing and duration of viewing sessions, and the sources of such content.

197. This information also included content viewed through third-party applications, broadcast signals, and external devices connected via HDMI.

198. The viewing information collected by Sony constituted private facts because it reflected Plaintiff's personal interests, habits, and preferences.

199. Such viewing activity is inherently private and is not ordinarily exposed to the public.

200. Sony disclosed this private information to third parties, including advertisers, analytics providers, and other commercial entities.

201. Upon information and belief, Sony shared or made available Plaintiff's viewing data to these third parties in a manner that enabled them to use the data for targeted advertising, analytics, and profiling purposes.

CLASS ACTION COMPLAINT

202. Sony's disclosures were not limited to a small or confidential group but instead were made to multiple third-party entities within the advertising and data ecosystem.

203. Through these disclosures, Plaintiff's private viewing information was disseminated beyond Sony and into a broader commercial network.

204. Sony's disclosures were made without Plaintiff's consent.

205. Any purported consent obtained by Sony was invalid because it was not informed, explicit, or meaningful.

206. Sony obscured the nature of its data collection and disclosure practices through misleading terminology, including labeling its ACR features as "Interactive TV" or "Samba Interactive TV."

207. Sony further presented disclosures during a forced, multi-step setup process that pressured consumers to agree to all terms in order to use the television.

208. Sony's disclosures failed to clearly inform users that Sony would share their viewing information with third parties.

209. Sony also failed to adequately disclose the scope and nature of the information being disclosed.

210. Even where settings existed to limit data sharing, those settings were difficult to locate, buried within multiple layers of menus, and not clearly described.

211. Sony's consent framework therefore constitutes a "dark pattern" designed to obtain user acquiescence rather than informed consent.

212. The private facts disclosed by Sony would be highly offensive and objectionable to a reasonable person.

213. A reasonable consumer would not expect that a television manufacturer would collect and disclose detailed information about their viewing habits to third parties.

214. The disclosure of such information exposes intimate details about an individual's interests, beliefs, and lifestyle.

215. Sony's conduct therefore constitutes a public disclosure of private facts.

CLASS ACTION COMPLAINT

216.   As a direct and proximate result of Sony's conduct, Plaintiff and members of the Class have suffered harm, including invasion of privacy, loss of control over personal information, and related damages.

217.   Plaintiff and members of the Class are entitled to all available legal and equitable remedies, including compensatory damages, injunctive relief, and any other relief deemed appropriate by the Court.

## COUNT III

**Invasion of Privacy – Violation of the California Constitution (Art. I, § 1)**

(On Behalf of Plaintiff and the Nationwide Class, or in the alternative, the California Subclass)

218.   Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

219.   Plaintiff brings this claim under Article I, Section 1 of the California Constitution, which guarantees a right to privacy.

220.   The California Constitution protects individuals against the invasion of their privacy by private entities, including the unauthorized collection, use, and disclosure of personal information.

221.   To establish a violation of the constitutional right to privacy, a plaintiff must show: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) a serious invasion of privacy.

222.   Plaintiff and members of the Class possessed legally protected privacy interests in their personal information, including their television viewing activity and related audiovisual data.

223.   Plaintiff's viewing behavior, including the content watched, the timing and duration of viewing sessions, and the sources of such content, constituted sensitive personal information.

224.   This information revealed details about Plaintiff's interests, habits, preferences, and personal characteristics.

225.   Plaintiff and members of the Class had a reasonable expectation that their television viewing activity within their homes would remain private.

CLASS ACTION COMPLAINT

226.    The home is among the most private of spaces, and activities occurring within the home—including television viewing—are traditionally understood to be private.

227.    Defendant Sony violated Plaintiff's reasonable expectation of privacy by collecting, analyzing, and disclosing Plaintiff's viewing data through its Smart TVs and embedded ACR technology.

228.    Specifically, Sony's ACR system captured audio and visual information from content displayed on the television screen in near real time.

229.    This capture occurred continuously during use of the television and operated independently of the source of the content.

230.    Sony's surveillance extended to content viewed through streaming applications, broadcast television, and external devices connected via HDMI.

231.    Sony thereby monitored Plaintiff's viewing activity across all inputs and sources.

232.    Sony used the information obtained through this surveillance to build detailed profiles of Plaintiff's viewing habits and preferences.

233.    Sony further disclosed or made this information available to third parties, including advertisers and analytics providers, for commercial purposes.

234.    Sony's conduct constituted a serious invasion of Plaintiff's privacy.

235.    The scope, duration, and nature of Sony's surveillance—continuous monitoring of audiovisual content within the home—were highly intrusive.

236.    Sony's conduct enabled the collection of detailed and sensitive information about Plaintiff's private life.

237.    Plaintiff and members of the Class did not consent to Sony's collection, use, or disclosure of their viewing data.

238.    Any purported consent obtained by Sony was invalid because it was not informed, explicit, or meaningful.

31

CLASS ACTION COMPLAINT

239. Sony obscured the nature of its surveillance through misleading terminology, including labeling the feature as "Interactive TV" or "Samba Interactive TV," which did not disclose that the feature enabled continuous monitoring of on-screen content.

240. Sony further presented disclosures during a forced, multi-step setup process that pressured consumers to agree to all terms in order to use the television.

241. Sony's disclosures failed to clearly inform users that Sony would collect, analyze, and share detailed viewing information.

242. Sony also failed to disclose the full scope and purpose of its data collection and sharing practices.

243. Even where settings existed to limit data collection or sharing, those settings were difficult to locate, buried within multiple layers of menus, and not clearly described.

244. Sony's consent framework therefore constitutes a "dark pattern" designed to obtain user acquiescence rather than informed consent.

245. Moreover, Sony's surveillance affected individuals who never interacted with Sony's disclosures or consent mechanisms, including other household members and guests.

246. Sony's conduct therefore violated Plaintiff's right to privacy under the California Constitution.

247. As a direct and proximate result of Sony's conduct, Plaintiff and members of the Class have suffered harm, including invasion of privacy, loss of control over personal information, and related damages.

248. Plaintiff and members of the Class are entitled to all available legal and equitable remedies, including injunctive relief and any other relief deemed appropriate by the Court.

**COUNT IV**

**Violation of the California Invasion of Privacy Act (CIPA), Cal. Penal Code § 631**

(On Behalf of Plaintiff and the Nationwide Class, or in the alternative, the California Subclass)

249. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

CLASS ACTION COMPLAINT

250. CIPA § 631 prohibits any person who by means of any "machine, instrument, contrivance" or in "any other manner:" (1) intentionally taps or makes an unauthorized connection with "any telegraph or telephone wire, line, cable, or instrument;" (2) willfully and without consent of "all parties to the communication" or in "any unauthorized manner" reads or "attempts to read" or "learn[s] the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within" California; (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way" information so obtained; or (4) from aiding, agreeing, employing, or conspiring with "any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

251. Defendants are persons under CIPA § 631.

252. At all relevant times, Plaintiff and members of the Class used Sony Smart TVs to access and display audiovisual content transmitted over the internet and other communication networks while in California.

253. These transmissions—including streaming video content, application data, and audiovisual signals delivered through HDMI-connected devices—constituted "communications" within the meaning of CIPA.

254. Defendant Sony—directed from and within California—through its Smart TVs and embedded ACR technology, enabled, facilitated, and caused third parties—including, but not limited to, Samba TV—to intercept Plaintiff's communications while they were in transit.

255. Specifically, Sony integrated and deployed third-party ACR and analytics technologies within its Smart TVs that captured audio and/or visual information from content displayed on the television screen in near real time.

256. These third-party technologies intercepted communications transmitted to and from Plaintiff's device, including content delivered through streaming services, broadcast signals, and external devices connected via HDMI.

33

CLASS ACTION COMPLAINT

257. This interception occurred contemporaneously with the transmission and display of audiovisual content, while such communications were in transit, and before they reached a completed and static form.

258. By capturing fragments of audiovisual output and processing them to identify the underlying content, these third parties acquired the contents and meaning of Plaintiff's communications.

259. Sony knowingly aided, agreed with, employed, and conspired with these third parties to intercept, read, and learn the contents of Plaintiff's communications in violation of Cal. Penal Code § 631(a).

260. Sony provided the hardware, software environment, and system-level access necessary for these third parties to perform the interception.

261. Sony also configured its Smart TVs to permit and facilitate the operation of these third-party interception technologies across all inputs, including:

- content streamed through third-party applications;
- cable and broadcast television signals; and
- content from external devices such as streaming boxes, gaming consoles, and computers connected via HDMI.

262. As a result, third parties intercepted communications that occurred entirely outside of Sony's own services or platforms.

263. Sony's conduct was not necessary to provide the core functionality of the television and instead served Sony's commercial interests in data collection, analytics, and targeted advertising.

264. Plaintiff and members of the Class did not consent to Sony's interception of their communications.

265. Any purported consent obtained by Sony was invalid because it was not informed, explicit, or meaningful.

34

CLASS ACTION COMPLAINT

266. Sony obscured the nature of its ACR surveillance through misleading terminology, including labeling the feature as "Interactive TV" or "Samba Interactive TV," which did not disclose that the feature enabled continuous monitoring of on-screen content.

267. Sony further presented its disclosures during a forced, multi-step setup process that pressured consumers to agree to all terms in order to use the television.

268. Sony's disclosures failed to clearly inform users that Sony would capture, analyze, and monetize the audio and video content displayed on their screens.

269. Sony also failed to disclose that such data would be shared with or made available to third parties.

270. Even where settings existed to disable ACR functionality, those settings were difficult to locate, buried within multiple layers of menus, and not clearly described.

271. Sony's consent framework therefore constitutes a "dark pattern" designed to obtain user acquiescence rather than informed consent.

272. Moreover, Sony's surveillance captured communications of individuals who never interacted with Sony's disclosures or consent mechanisms, including other household members and guests.

273. Because CIPA requires the consent of all parties to a communication, the interception of communications by Sony's third-party partners—including, but not limited to, Samba TV—was unlawful..

274. Plaintiff and members of the Class had a reasonable expectation that their viewing activity—including the audiovisual content displayed on their televisions—would not be intercepted or monitored by Sony.

275. Sony's conduct constitutes an egregious invasion of privacy and a violation of California law.

276. As a direct and proximate result of Sony's violations of CIPA, Plaintiff and members of the Class have suffered harm, including invasion of privacy, loss of control over personal information, and statutory damages.

CLASS ACTION COMPLAINT

277.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and members of the Class seek statutory damages, injunctive relief, and all other relief available under the law.

## COUNT V

### Violation of the California Invasion of Privacy Act (CIPA), Cal. Penal Code § 632

(On Behalf of Plaintiff and the Nationwide Class, or in the alternative, the California Subclass)

278.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

279.    Cal. Penal Code § 632 prohibits any person, without the consent of all parties to a confidential communication, from intentionally eavesdropping upon or recording the confidential communication by means of any electronic amplifying or recording device.

280.    At all relevant times, Plaintiff and members of the Class engaged in communications through their use of Sony Smart TVs, including audiovisual transmissions delivered through streaming applications, broadcast signals, and external devices connected via HDMI.

281.    These transmissions included audio and audiovisual communications that were transmitted to and from Plaintiff's television through internet and other communication networks.

282.    The communications at issue were "confidential communications" within the meaning of Cal. Penal Code § 632.

283.    Defendant Sony, through its Smart TVs and embedded ACR technology, enabled, facilitated, and caused third parties—including, but not limited to, Samba TV—to eavesdrop upon and record Plaintiff's confidential communications.

284.    Specifically, Sony integrated and deployed third-party ACR and analytics technologies within its Smart TVs that captured audio and/or audiovisual information from content displayed on the television screen in near real time.

285.    These third-party technologies recorded and otherwise acquired the contents of communications transmitted to and from Plaintiff's television, including audio components of such communications.

36

CLASS ACTION COMPLAINT

286.    This recording occurred contemporaneously with the transmission and playback of audiovisual content and functioned independently of the source of the communication.

287.    Sony knowingly aided, agreed with, employed, and conspired with these third parties to eavesdrop upon and record Plaintiff's confidential communications in violation of Cal. Penal Code § 632.

288.    Sony provided third parties with persistent identifiers, device-level access, and content recognition outputs sufficient to associate recorded communications with specific users and households.

289.    Plaintiff and members of the Class reasonably expected that their viewing activity and the audio and audiovisual content displayed within their homes would not be recorded or monitored by Sony.

290.    The communications occurred within private residences and concerned personal viewing choices, habits, and interests, which are inherently private in nature.

291.    The fact that such communications were transmitted over electronic networks does not eliminate their confidential nature.

292.    Sony's conduct, including its facilitation of third-party recording technologies, defeated Plaintiff's reasonable expectation of privacy by enabling the secret capture and recording of these communications.

293.    Sony configured its Smart TVs to permit and facilitate the operation of these third-party recording technologies across all inputs, including:

- content streamed through third-party applications;

- cable and broadcast television signals; and

- content from external devices such as streaming boxes, gaming consoles, and computers connected via HDMI, as well as other personal devices connected over Wi-Fi internet, such as computers, smartphones and tablets.

294.    As a result, third parties recorded communications that occurred entirely outside of Sony's own services or platforms.

37

CLASS ACTION COMPLAINT

295. Sony's conduct was not necessary to provide the core functionality of the television and instead served Sony's commercial interests in data collection, analytics, and advertising.

296. Plaintiff and members of the Class did not consent to the recording of their confidential communications by Sony's third-party partners.

297. Any purported consent obtained by Sony was invalid because it was not informed, explicit, or meaningful.

298. Sony obscured the nature of its ACR surveillance through misleading terminology, including labeling the feature as "Interactive TV" or "Samba Interactive TV," which did not disclose that the feature enabled continuous recording of audio and audiovisual content.

299. Sony further presented its disclosures during a forced, multi-step setup process that pressured consumers to agree to all terms in order to use the television.

300. Sony's disclosures failed to clearly inform users that Sony would record and analyze the audio and audiovisual content displayed on their screens.

301. Sony also failed to disclose that such data would be shared with or made available to third parties.

302. Even where settings existed to disable ACR functionality, those settings were difficult to locate, buried within multiple layers of menus, and not clearly described.

303. Sony's consent framework therefore constitutes a "dark pattern" designed to obtain user acquiescence rather than informed consent.

304. Moreover, Sony's recording captured communications of individuals who never interacted with Sony's disclosures or consent mechanisms, including other household members and guests.

305. Because CIPA requires the consent of all parties to a communication, the recording of communications by Sony's third-party partners—including, but not limited to, Samba TV— was unlawful.

38

CLASS ACTION COMPLAINT

306. Plaintiff and members of the Class had a reasonable expectation that their confidential communications—including audiovisual content viewed within their homes—would not be recorded by Sony.

307. Sony's conduct constitutes an egregious invasion of privacy and a violation of California law.

308. As a direct and proximate result of Sony's violations of Cal. Penal Code § 632, Plaintiff and members of the Class have suffered harm, including invasion of privacy, loss of control over personal information, and statutory damages.

309. Pursuant to Cal. Penal Code § 637.2, Plaintiff and members of the Class statutory damages, injunctive relief, and all other relief available under the law.

### COUNT VI

**Violation of the California Invasion of Privacy Act (CIPA), Cal. Penal Code §§ 638.50–638.51**

(On Behalf of Plaintiff and the Nationwide Class, or in the alternative, the California Subclass)

310. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

311. Cal. Penal Code § 638.50 prohibits any person or entity from knowingly installing or using a pen register or trap and trace device without first obtaining a court order or authorization as required by law.

312. Cal. Penal Code § 638.51 prohibits any person or entity from installing or using a pen register or trap and trace device without the consent of the user of the service.

313. A "pen register" is defined under California law as a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted.

314. A "trap and trace device" is defined as a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing,

39

CLASS ACTION COMPLAINT

addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication.

315.   At all relevant times, Plaintiff and members of the Class used Sony Smart TVs to send and receive electronic communications over the internet and other communication networks while in California.

316.   These communications included, among other things:

- requests for streaming video content;

- application usage data;

- device-level communications between Smart TVs and remote servers; and

- audiovisual transmissions delivered to the television through streaming services and external devices.

317.   Defendant Sony, through its Smart TVs and embedded ACR technology, knowingly installed and operated processes that functioned as pen registers and trap and trace devices.

318.   Specifically, Sony's ACR system and related telemetry processes captured and recorded routing, addressing, and signaling information associated with communications transmitted to and from Plaintiff's Smart TV.

319.   This information included, among other things:

- identifiers associated with content being requested or displayed;

- application identifiers and usage signals;

- device identifiers and network information; and

- other metadata reflecting how, when, and from where communications were transmitted.

320.   Sony's systems captured this information contemporaneously with the transmission of communications and without regard to the source of the content.

321.   By capturing and processing this information, Sony recorded dialing, routing, addressing, and signaling information associated with Plaintiff's electronic communications.

40

CLASS ACTION COMPLAINT

322. Sony also captured incoming and outgoing communication signals sufficient to identify the source and destination of communications involving Plaintiff's Smart TV.

323. Sony's conduct therefore constituted the use of pen registers and trap and trace devices within the meaning of Cal. Penal Code §§ 638.50–638.51.

324. Sony installed and used these devices and processes without obtaining a court order or lawful authorization.

325. Sony also installed and used these devices and processes without the consent of Plaintiff and members of the Class.

326. Plaintiff and members of the Class were not informed that Sony would capture routing, addressing, and signaling information associated with their communications.

327. Any purported consent obtained by Sony was invalid because it was not informed, explicit, or meaningful.

328. Sony obscured the nature of its data collection through misleading terminology, including labeling its surveillance features as "Interactive TV" or "Samba Interactive TV."

329. Defendant Sony, through its Smart TVs and embedded ACR technology, enabled, facilitated, and caused third parties—including, but not limited to, Samba TV—to eavesdrop upon and record Plaintiff's confidential communications.

330. Specifically, Sony integrated and deployed third-party ACR and analytics technologies within its Smart TVs that captured audio and/or audiovisual information from content displayed on the television screen in near real time.

331. These third-party technologies recorded and otherwise acquired the contents of communications transmitted to and from Plaintiff's television, including audio components of such communications.

332. This recording occurred contemporaneously with the transmission and playback of audiovisual content and functioned independently of the source of the communication.

41

CLASS ACTION COMPLAINT

333.    Sony knowingly aided, agreed with, employed, and conspired with these third parties to eavesdrop upon and record Plaintiff's confidential communications in violation of Cal. Penal Code § 632.

334.    Moreover, Sony's data collection captured communications and associated signaling information of individuals who never interacted with Sony's disclosures or consent mechanisms, including other household members and guests.

335.    Plaintiff and members of the Class had a reasonable expectation that the routing, addressing, and signaling information associated with their communications would not be captured or monitored by Sony.

336.    Sony's conduct constitutes an egregious invasion of privacy and a violation of California law.

337.    As a direct and proximate result of Sony's violations of Cal. Penal Code §§ 638.50–638.51, Plaintiff and members of the Class have suffered harm, including invasion of privacy, loss of control over personal information, and statutory damages.

338.    Pursuant to Cal. Penal Code § 637.2 and other applicable provisions, Plaintiff and members of the Class seek statutory damages, injunctive relief, and all other relief available under the law.

**COUNT VII**

**Violation of the Comprehensive Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502**

(On Behalf of Plaintiff and the Nationwide Class, or in the alternative, the California Subclass)

339.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

340.    Plaintiff brings this claim under the Comprehensive Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502.

341.    At all relevant times, Plaintiff's Sony Smart TV constituted a "computer," "computer system," and/or "computer network" within the meaning of Cal. Penal Code § 502(b).

42

CLASS ACTION COMPLAINT

342. Plaintiff and members of the Class were the owners and/or authorized users of their Sony Smart TVs.

343. Defendant Sony knowingly and without permission accessed, used, and caused to be used Plaintiff's Smart TV and related computer systems.

344. Specifically, Sony, through its embedded ACR technology and related software processes, accessed Plaintiff's Smart TV to collect, extract, and transmit data regarding Plaintiff's viewing activity.

345. Sony's conduct included taking, copying, and making use of data from Plaintiff's Smart TV, including audiovisual content information, device-level data, and associated identifiers.

346. Sony used this data for its own commercial purposes, including advertising, analytics, and consumer profiling.

347. Sony's conduct violated Cal. Penal Code § 502(c), including but not limited to:

- § 502(c)(1), by knowingly accessing and without permission altering, damaging, deleting, destroying, or otherwise using data and computer systems;

- § 502(c)(2), by knowingly accessing and without permission taking, copying, or making use of data from a computer, computer system, or computer network;

- § 502(c)(3), by knowingly and without permission using or causing to be used computer services; and

- § 502(c)(7), by knowingly accessing or causing to be accessed any computer, computer system, or computer network without permission.

348. Sony's access to Plaintiff's Smart TV and associated data was without permission because Plaintiff did not authorize Sony to collect, extract, or monetize detailed information about the audiovisual content displayed on the device.

349. Any purported authorization obtained by Sony was invalid because it was not informed, explicit, or meaningful.

43

CLASS ACTION COMPLAINT

350. Sony obscured the nature of its data access and collection practices through misleading terminology, including labeling its ACR features as "Interactive TV" or "Samba Interactive TV."

351. Sony further presented disclosures during a forced, multi-step setup process that pressured consumers to agree to all terms in order to use the television.

352. Sony's disclosures failed to clearly inform users that Sony would access and extract detailed viewing information from their devices.

353. Sony also failed to disclose that such data would be used for advertising, analytics, and profiling purposes or shared with third parties.

354. Even where settings existed to limit data collection, those settings were difficult to locate, buried within multiple layers of menus, and not clearly described.

355. Sony's consent framework therefore constitutes a "dark pattern" designed to obtain user acquiescence rather than informed consent.

356. Moreover, Sony's conduct resulted in the access and use of data associated with individuals who never interacted with Sony's disclosures or consent mechanisms, including other household members and guests.

357. As a direct and proximate result of Sony's conduct, Plaintiff and members of the Class suffered damage and loss within the meaning of Cal. Penal Code § 502(e), including but not limited to:

- unauthorized use of their devices and data;

- misappropriation of valuable personal information; and

- loss of control over their data.

358. Sony's conduct was knowing, intentional, and wrongful.

359. Pursuant to Cal. Penal Code § 502(e) and (e)(1), Plaintiff and members of the Class seek compensatory damages, injunctive relief, and all other relief available under the law.

44

CLASS ACTION COMPLAINT

**COUNT VIII**

**Violation of the Federal Wiretap Act (as amended by the Electronic Communications Privacy Act or "ECPA"), 18 U.S.C. § 2510, et seq.**

(On Behalf of Plaintiff and the Nationwide Class)

360.   Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

361.   Plaintiff brings this claim under the Federal Wiretap Act, 18 U.S.C. § 2510, et seq.

362.   The Federal Wiretap Act prohibits any person from intentionally intercepting, endeavoring to intercept, or procuring any other person to intercept any wire, oral, or electronic communication, as well as from using or disclosing the contents of such communications without consent.

363.   At all relevant times, Plaintiff and members of the Nationwide Class transmitted and received electronic communications through their use of Sony Smart TVs.

364.   These communications included, among other things, streaming video content, audiovisual transmissions, application data, and communications between Plaintiff's Smart TV and remote servers.

365.   These transmissions constitute "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

366.   Defendant Sony, through its Smart TVs and embedded ACR technology, intentionally intercepted, endeavored to intercept, and procured the interception of these communications.

367.   Specifically, Sony's ACR system captured audio and/or visual information from content displayed on Plaintiff's television screen in near real time.

368.   This capture occurred contemporaneously with the transmission and display of the communications.

369.   By capturing fragments of audiovisual output and processing them to identify underlying content, Sony acquired the contents of Plaintiff's electronic communications.

45

CLASS ACTION COMPLAINT

370.    Sony's interception occurred while the communications were in transit, and before they reached their intended destination in a completed and static form.

371.    Sony's ACR system captured communications across all inputs, including:

- content streamed through third-party applications;

- cable and broadcast television signals; and

- content from external devices such as streaming boxes, gaming consoles, and computers connected via HDMI.

372.    As a result, Sony intercepted communications that occurred entirely outside of Sony's own services or platforms.

373.    Sony also used and disclosed the contents of these communications for its own commercial purposes, including advertising, analytics, and profiling.

374.    Sony's conduct was intentional.

375.    Plaintiff and members of the Nationwide Class did not consent to Sony's interception, use, or disclosure of their communications.

376.    Any purported consent obtained by Sony was invalid because it was not informed, explicit, or meaningful.

377.    Even if Sony were deemed a party to any of the intercepted communications, the statutory exception set forth in 18 U.S.C. § 2511(2)(d) does not apply because Sony intercepted such communications for the purpose of committing tortious and unlawful acts.

378.    Specifically, Sony intercepted Plaintiff's communications in order to collect, analyze, monetize, and disclose detailed information regarding Plaintiff's viewing activity without authorization.

379.    Sony's interception was undertaken for the purpose of committing, and in furtherance of committing, multiple independent torts and statutory violations, including:

- invasion of privacy – intrusion upon seclusion;

- invasion of privacy – public disclosure of private facts;

- invasion of privacy in violation of the California Constitution;

46

CLASS ACTION COMPLAINT

- violations of the California Invasion of Privacy Act (Cal. Penal Code §§ 631, 632, and 638.50–638.51);
- violations of the Video Privacy Protection Act (18 U.S.C. § 2710);
- violations of the California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200); and
- unjust enrichment and other unlawful business practices.

380.    Sony's interception of communications was therefore carried out for a tortious and unlawful purpose within the meaning of 18 U.S.C. § 2511(2)(d).

381.    Accordingly, any purported consent—whether actual, implied, or constructive—does not shield Sony from liability under the Federal Wiretap Act.

382.    Sony's disclosures further obscured the nature of its surveillance through misleading terminology, including labeling its ACR features as "Interactive TV" or "Samba Interactive TV."

383.    Sony presented disclosures during a forced, multi-step setup process that pressured consumers to agree to all terms in order to use the television, and failed to clearly inform users that Sony would intercept, record, analyze, and monetize the content of their communications.

384.    Sony's conduct therefore was not authorized by law and does not fall within any statutory exception.

385.    As a direct and proximate result of Sony's violations of the Federal Wiretap Act, Plaintiff and members of the Nationwide Class have suffered harm, including invasion of privacy, loss of control over personal information, and statutory damages.

386.    Pursuant to 18 U.S.C. § 2520, Plaintiff and members of the Nationwide Class seek statutory damages, punitive damages, injunctive relief, and all other relief available under the law.

**COUNT IX**

**Violation of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710**

(On Behalf of Plaintiff and the Nationwide Class)

47

CLASS ACTION COMPLAINT

387. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

388. Plaintiff brings this claim under the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710.

389. The VPPA prohibits a "video tape service provider" from knowingly disclosing to any person personally identifiable information concerning a consumer's request for or obtaining of specific video materials or services, without the informed, written consent of the consumer.

390. Defendant Sony was, and is, a "video tape service provider" within the meaning of 18 U.S.C. § 2710(a)(4), because it engaged in the business of delivering, providing, and facilitating access to audiovisual content and video programming through its Smart TVs and integrated software platforms.

391. Plaintiff was a "consumer" within the meaning of 18 U.S.C. § 2710(a)(1), as Plaintiff used Sony's Smart TV services to obtain video content.

392. Defendant Sony knowingly disclosed to third parties personally identifiable information ("PII") concerning Plaintiff's requests for and viewing of specific video materials and services.

393. Specifically, Sony collected and disclosed detailed information about the audiovisual content displayed on Plaintiff's television, including the programs watched, the timing and duration of viewing sessions, and the sources of such content.

394. This information included content viewed through streaming applications, broadcast signals, and external devices connected via HDMI.

395. Sony disclosed this viewing information to third parties, including advertisers, analytics providers, and other commercial entities.

396. Upon information and belief, Sony disclosed Plaintiff's viewing data in conjunction with persistent identifiers and other information that allowed third parties to identify Plaintiff and/or Plaintiff's household.

CLASS ACTION COMPLAINT

397. These identifiers included, among other things, device identifiers, network identifiers, and other unique identifiers associated with Plaintiff's Smart TV.

398. By linking viewing information with such identifiers, Sony disclosed information that identified Plaintiff as having requested or obtained specific video materials or services.

399. The information disclosed by Sony therefore constituted "personally identifiable information" within the meaning of the VPPA.

400. Sony made these disclosures knowingly.

401. Plaintiff did not provide informed, written consent to Sony's disclosure of Plaintiff's personally identifiable viewing information.

402. Any purported consent obtained by Sony was invalid because it was not informed, was not specific to the disclosure of video viewing information, and was not provided in a standalone written form as required by the VPPA.

403. Sony obscured the nature of its data collection and disclosure practices through misleading terminology, including labeling its ACR features as "Interactive TV" or "Samba Interactive TV."

404. Sony further presented disclosures during a forced, multi-step setup process that pressured consumers to agree to all terms in order to use the television.

405. Sony's disclosures failed to clearly inform users that Sony would disclose their video viewing information to third parties.

406. Sony also failed to disclose the scope, nature, and purpose of such disclosures.

407. Even where settings existed to limit data sharing, those settings were difficult to locate, buried within multiple layers of menus, and not clearly described.

408. Sony's consent framework therefore constitutes a "dark pattern" designed to obtain user acquiescence rather than informed consent.

409. Sony's conduct constituted a violation of 18 U.S.C. § 2710(b)(1).

49

CLASS ACTION COMPLAINT

410.    As a direct and proximate result of Sony's violations of the VPPA, Plaintiff and members of the Nationwide Class have suffered harm, including invasion of privacy and loss of control over personal information.

411.    Pursuant to 18 U.S.C. § 2710(c), Plaintiff and members of the Nationwide Class seek statutory damages, punitive damages, attorneys' fees and costs, injunctive relief, and all other relief available under the law.

## COUNT X

### Negligence

(On Behalf of Plaintiff and the Nationwide Class, or in the alternative, the California Subclass)

412.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

413.    Plaintiff brings this claim under California common law.

414.    At all relevant times, Defendant Sony owed Plaintiff and members of the Class a duty to exercise reasonable care in the design, development, manufacture, configuration, and operation of its Smart TVs and embedded software systems.

415.    Sony also owed a duty to refrain from collecting, accessing, using, and disclosing Plaintiff's personal information without authorization or adequate disclosure.

416.    Sony further owed a duty to implement reasonable practices to protect consumers' privacy and to avoid engaging in conduct that foreseeably invaded users' privacy interests.

417.    Sony knew or should have known that its Smart TVs would be used within consumers' homes and would display sensitive audiovisual content reflecting users' personal interests, habits, and preferences.

418.    Sony knew or should have known that the continuous monitoring and capture of such content through ACR technology would intrude upon users' privacy and expose sensitive personal information.

419.    Sony breached its duties by, among other things:

50

CLASS ACTION COMPLAINT

- designing and deploying ACR technology that continuously monitored and captured audiovisual content displayed on users' televisions;

- collecting detailed information about Plaintiff's viewing activity without adequate disclosure or authorization;

- accessing and extracting data from Plaintiff's Smart TV for purposes unrelated to core device functionality;

- failing to implement reasonable and transparent consent mechanisms;

- obscuring its data collection practices through misleading terminology and design; and

- disclosing or making available Plaintiff's viewing information to third parties for commercial purposes.

420. Sony's conduct fell below the standard of care expected of a reasonable company operating connected consumer devices in the home.

421. Sony's actions were negligent and created a foreseeable risk of harm to Plaintiff and members of the Class.

422. Plaintiff and members of the Class did not consent to Sony's conduct.

423. Any purported consent obtained by Sony was invalid because it was not informed, explicit, or meaningful.

424. Sony's conduct was a substantial factor in causing harm to Plaintiff and members of the Class.

425. As a direct and proximate result of Sony's negligence, Plaintiff and members of the Class have suffered damages, including invasion of privacy, loss of control over personal information, and the unauthorized use and exploitation of their data.

426. Plaintiff and members of the Class are entitled to recover damages, injunctive relief, and all other relief available under California law.

51

CLASS ACTION COMPLAINT

## COUNT XI

### Breach of Implied Contract

(On Behalf of Plaintiff and the Nationwide Class, or in the alternative, the California Subclass)

427.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

428.    Plaintiff brings this claim under California common law.

429.    At all relevant times, Plaintiff and Defendant Sony entered into implied contracts under which Sony agreed to provide Smart TVs and related services in exchange for Plaintiff's payment and use of the device.

430.    These implied contracts included an understanding that Sony would not collect, access, use, or disclose Plaintiff's personal information—including detailed viewing activity—beyond what was necessary to provide the core functionality of the Smart TV, and would do so only with adequate disclosure and authorization.

431.    Plaintiff reasonably expected that Sony would not surreptitiously monitor, record, or monetize the audiovisual content displayed on Plaintiff's television.

432.    Plaintiff further reasonably expected that Sony would not share or make available such information to third parties without clear and informed consent.

433.    In exchange for these promises, Plaintiff provided valuable consideration, including payment for the Smart TV and the provision of access to data generated through use of the device.

434.    Sony accepted and retained this consideration.

435.    Sony breached the implied contract by, among other things:

- collecting detailed information about Plaintiff's viewing activity through ACR technology;

- continuously monitoring audiovisual content displayed on Plaintiff's television;

- accessing and extracting data from Plaintiff's Smart TV for purposes unrelated to core device functionality;

52

CLASS ACTION COMPLAINT

- using Plaintiff's data for advertising, analytics, and profiling purposes; and

- disclosing or making available Plaintiff's viewing information to third parties.

436. Sony's conduct exceeded the scope of any reasonable expectations arising from its relationship with Plaintiff.

437. Sony did not adequately disclose these practices or obtain valid authorization from Plaintiff.

438. Any purported consent obtained by Sony was invalid because it was not informed, explicit, or meaningful.

439. Sony obscured the nature of its data collection and disclosure practices through misleading terminology, including labeling its ACR features as "Interactive TV" or "Samba Interactive TV."

440. Sony further presented disclosures during a forced, multi-step setup process that pressured consumers to agree to all terms in order to use the television.

441. Sony's disclosures failed to clearly inform users that Sony would collect, analyze, and monetize detailed viewing information.

442. Sony also failed to disclose that such information would be shared with or made available to third parties.

443. Even where settings existed to limit data collection or sharing, those settings were difficult to locate, buried within multiple layers of menus, and not clearly described.

444. Sony's consent framework therefore constitutes a "dark pattern" designed to obtain user acquiescence rather than informed consent.

445. As a direct and proximate result of Sony's breach, Plaintiff and members of the Class have suffered damages, including the loss of the benefit of their bargain and the unauthorized use and exploitation of their personal information.

446. Plaintiff and members of the Class are entitled to recover damages and all other relief available under California law.

53

CLASS ACTION COMPLAINT

**COUNT XII**

**Violation of California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 et seq.**

(On Behalf of Plaintiff and the Nationwide Class, or in the alternative, the California Subclass)

447. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

448. Plaintiff brings this claim under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 et seq.

449. The UCL prohibits any unlawful, unfair, or fraudulent business act or practice.

450. Defendant Sony engaged in unlawful, unfair, and fraudulent business acts and practices in connection with its Smart TVs and embedded ACR technology.

**1.     Unlawful Prong**

451. Sony's conduct violated multiple laws, including but not limited to:

- the California Invasion of Privacy Act (Cal. Penal Code §§ 631, 632, 638.50–638.51);

- the Comprehensive Computer Data Access and Fraud Act (Cal. Penal Code § 502); and

- the Federal Wiretap Act (18 U.S.C. § 2510 et seq.).

452. These violations constitute "unlawful" business acts and practices under the UCL.

**2.     Unfair Prong**

453. Sony's conduct was unfair because it offended established public policy and was immoral, unethical, oppressive, and substantially injurious to consumers.

454. Sony's conduct caused substantial injury to Plaintiff and members of the Class by invading their privacy and misappropriating their personal information.

455. The harm to Plaintiff and members of the Class outweighed any purported benefits associated with Sony's conduct.

456. Plaintiff and members of the Class could not reasonably have avoided the injury.

54

CLASS ACTION COMPLAINT

457.    Sony's surveillance practices were not necessary to provide the core functionality of its Smart TVs and instead served Sony's commercial interests in data collection and advertising.

458.    Sony continuously monitored the content displayed on consumers' televisions, including content from streaming applications, broadcast signals, and HDMI-connected devices.

459.    Sony collected, analyzed, and monetized detailed information about Plaintiff's viewing activity.

460.    Sony also shared or made this information available to third parties, including advertisers and analytics providers.

461.    Sony's conduct therefore constituted an unfair business practice.

**3.    Fraudulent Prong**

462.    Sony's conduct was fraudulent because it was likely to deceive reasonable consumers.

463.    Sony misrepresented and omitted material facts regarding its data collection and surveillance practices.

464.    Sony used misleading terminology, including labeling its ACR features as "Interactive TV" or "Samba Interactive TV," which did not disclose that the feature enabled continuous monitoring of on-screen content.

465.    Sony failed to clearly disclose that it would capture, analyze, and monetize the audiovisual content displayed on consumers' televisions.

466.    Sony also failed to disclose that such information would be shared with or made available to third parties.

467.    Sony presented disclosures during a forced, multi-step setup process that pressured consumers to agree to all terms in order to use the television.

468.    Even where settings existed to limit data collection, those settings were difficult to locate, buried within multiple layers of menus, and not clearly described.

469.    Sony's consent framework therefore constitutes a "dark pattern" designed to obtain user acquiescence rather than informed consent.

CLASS ACTION COMPLAINT

470.    These misrepresentations and omissions were material because a reasonable consumer would consider them important in deciding whether to purchase or use a Sony Smart TV.

471.    Plaintiff and members of the Class were likely to be deceived by Sony's conduct.

472.    As a result of Sony's unlawful, unfair, and fraudulent conduct, Plaintiff and members of the Class suffered injury in fact and lost money or property.

473.    Plaintiff and members of the Class lost the value of their personal information and the benefit of their bargain.

474.    Plaintiff and members of the Class would not have purchased, or would have paid less for, Sony Smart TVs had they known of Sony's conduct.

475.    Plaintiff seeks restitution, injunctive relief, and all other relief available under Cal. Bus. & Prof. Code § 17203.

## COUNT XIII

### Unjust Enrichment

(On Behalf of Plaintiff and the Nationwide Class, or in the alternative, the California Subclass)

476.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

477.    Plaintiff brings this claim for unjust enrichment under California law.

478.    Defendant Sony received and retained benefits at the expense of Plaintiff and members of the Class.

479.    Plaintiff conferred benefits on Sony, including payment for the Smart TV and valuable data generated through Plaintiff's use of the device.

480.    Plaintiff's viewing activity and associated data constituted valuable information that Sony collected, analyzed, and monetized.

481.    Sony knowingly accepted and retained these benefits.

482.    Sony appreciated and understood that it was receiving valuable benefits from Plaintiff, including access to and use of Plaintiff's personal information.

56

CLASS ACTION COMPLAINT

483. Sony obtained these benefits through its collection, use, and disclosure of Plaintiff's viewing data via its Smart TVs and embedded ACR technology.

484. Sony used Plaintiff's data for commercial purposes, including advertising, analytics, profiling, and data monetization.

485. Sony also shared or made this data available to third parties, thereby further profiting from Plaintiff's information.

486. Sony's retention of these benefits was unjust because it was obtained through deceptive, unlawful, and unfair conduct.

487. Sony collected and used Plaintiff's data without valid consent.

488. Any purported consent obtained by Sony was invalid because it was not informed, explicit, or meaningful.

489. Sony obscured the nature of its data collection and disclosure practices through misleading terminology, including labeling its ACR features as "Interactive TV" or "Samba Interactive TV."

490. Sony further presented disclosures during a forced, multi-step setup process that pressured consumers to agree to all terms in order to use the television.

491. Sony's disclosures failed to clearly inform users that Sony would collect, analyze, and monetize detailed viewing information.

492. Sony also failed to disclose that such information would be shared with or made available to third parties.

493. Even where settings existed to limit data collection or sharing, those settings were difficult to locate, buried within multiple layers of menus, and not clearly described.

494. Sony's consent framework therefore constitutes a "dark pattern" designed to obtain user acquiescence rather than informed consent.

495. It would be inequitable and unjust for Sony to retain the benefits it obtained from Plaintiff and members of the Class.

CLASS ACTION COMPLAINT

496.    As a direct and proximate result of Sony's conduct, Plaintiff and members of the Class have suffered harm.

497.    Plaintiff seeks restitution, disgorgement of all ill-gotten gains, and all other relief available under California law.

## COUNT XIV

### Injunctive Relief

(On Behalf of Plaintiff, the Nationwide Class, or in the alternative, the California Subclass)

498.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

499.    Plaintiff brings this claim for injunctive relief under applicable law, including but not limited to Cal. Bus. & Prof. Code § 17203, Cal. Penal Code § 637.2, 18 U.S.C. § 2520, and the Court's equitable powers.

500.    Defendant Sony engaged in, and continues to engage in, unlawful, unfair, and deceptive acts and practices as alleged herein.

501.    Sony's conduct included the ongoing collection, interception, recording, use, and disclosure of Plaintiff's and Class members' viewing data through its Smart TVs and embedded ACR technology.

502.    Absent injunctive relief, Sony will continue to engage in the unlawful and deceptive practices described herein.

503.    Plaintiff and members of the Class face a real and immediate threat of continued injury, as Sony's Smart TVs continue to operate with ACR functionality enabled or available.

504.    Plaintiff lacks an adequate remedy at law because monetary damages alone cannot fully compensate for the ongoing invasion of privacy and loss of control over personal information.

505.    Plaintiff seeks injunctive relief requiring Sony to, among other things:

- cease intercepting, recording, collecting, using, and disclosing viewing data without valid, informed, and express consent;

CLASS ACTION COMPLAINT

- implement clear, conspicuous, and truthful disclosures regarding its data collection and sharing practices;

- obtain affirmative, informed, and standalone consent before engaging in ACR-based data collection;

- provide users with a simple, effective, and easily accessible mechanism to disable ACR functionality;

- delete or permanently de-identify previously collected viewing data associated with Plaintiff and Class members; and

- refrain from using deceptive terminology or dark patterns in connection with its data practices.

506. The balance of equities favors granting injunctive relief because Sony's practices harm consumers' privacy rights and provide no countervailing benefit that outweighs that harm.

507. The public interest would be served by enjoining Sony's unlawful, unfair, and deceptive conduct.

508. Plaintiff and members of the Class are therefore entitled to injunctive and declaratory relief as requested herein.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests the Court enter judgment in their favor and against Sony as follows:

a. An award of damages, including actual, compensatory, general, special, incidental, consequential, and punitive damages, in an amount to be determined at trial;

b. Injunctive, declaratory, and other equitable relief as is appropriate;

c. Pre- and post-judgment interest to the extent provided by law;

d. Attorneys' fees to the extent provided by law;

e. Costs to the extent provided by law; and

f. Such other relief the Court deems just and proper.

CLASS ACTION COMPLAINT

## JURY TRIAL DEMAND

Plaintiff demands a jury trial for all claims so triable.

Dated:  March 23, 2026                    Respectfully submitted,

By:  */s/  Melisa A. Rosadini-Knott*

**PEIFFER WOLF CARR
KANE CONWAY & WISE LLP**

Melisa A. Rosadini-Knott
(California Bar No. 316369)
3435 Wilshire Blvd., Ste. 1400
Los Angeles, CA 90010-1923
Tel: 323-982-4109
mrosadini@peifferwolf.com

Brandon M. Wise*
One US Bank Plaza, Suite 1950
St. Louis, MO 63101
Tel: (314) 833-4825
bwise@peifferwolf.com

Andrew R. Tate*
235 Peachtree St. NE, Suite 400
Atlanta, GA 30303
Tel: (314) 669-3600
atate@peifferwolf.com


* *pro hac vice* forthcoming

*Counsel for Plaintiff and the Proposed Class*

60

CLASS ACTION COMPLAINT